UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FRAZIER INDUSTRIAL COMPANY,** **Plaintiff,** v. **NAVIGATORS INSURANCE COMPANY,** **Defendant.** | Civ. No. 13-1647 (WJM) OPINION |

Plaintiff Frazier Industrial Company ("Frazier") brings this action to recover alleged losses due to employee theft under a commercial crime insurance policy issued by the Defendant Navigators Insurance Company ("Navigators"). This matter comes before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"). The Court decides these motions without oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, the parties' motions are **GRANTED in part and DENIED in part**.

I.    BACKGROUND

   A.    The Insurance Policies

Navigators issued two successive commercial crime policies to Frazier. (Defendant's Statement of Undisputed Material Facts ("Def.'s SOF") at ¶ 1). The first policy was issued on September 14, 2009, for a period of one-year (the "2009 Policy"). (*Id.* ¶ 2). The second policy was issued from September 14, 2010 to June 30, 2011 (the "2010 Policy" or the "Crime Policy"). (*Id.* ¶ 3).

The two commercial crime policies contain identical language. The policies cover losses resulting from "Employee Theft," stating that:

> We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with others persons.

(Declaration of Mary E. Borja ("Borja Dec'l") Exs. A & B, ECF Nos. 39-1, 39-2). Theft is defined in the policies as "the unlawful taking of property to the deprivation of the Insured." (*Id*.) The policies exclude any loss resulting from a dishonest act other than theft:

> **c. Acts of Employees, Managers, Directors, Trustees Or Representatives**
>
> Loss resulting from "theft" or any other dishonest act committed by any or your "employees", "managers", directors, trustees or authorized representatives:
>
> (1) Whether acting alone or in collusion with other persons; or
>
> (2) While performing services for you or otherwise;
>
> except when covered under Insuring Agreement A.1.

(*Id*.) Also excluded is any coverage for indirect loss, which includes losses resulting from:

> Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property."

(*Id*.) Lastly, each policy is limited to a recovery of $1 million per occurrence[1] with a $10,000 deductible. (*Id*.)

### B. Factual Background

Frazier is a privately-owned manufacturer of structural steel storage systems. (Plaintiff's Statement of Undisputed Material Facts ("Pl.'s SOF") at ¶ 1). Frazier's sales to its customers include the installation of these systems, which are sometimes handled by an independent contractor. (*Id*. ¶ 2-3). The independent contractor's price is included in Frazier's quote to the customer, and the customer pays Frazier for both sales and installation. (*Id*. ¶¶ 6, 11).

In March 2011, Frazier was contacted by an attorney representing a judgment creditor for one of Frazier's independent contractors, Coast to Coast

---

[1] An occurrence is defined as "[a]n individual act; [t]he combined total of all separate acts whether or not related; or series of acts whether or not related committed by an 'employee' acting alone or in collusion with other persons . . . ." (*Id*.)

Installations, Inc. ("CTC"). (Certification of Sherilyn Pastor ("Pastor Cert.") Ex. K, ECF No. 36-3). Through an investigation, it was revealed that one of Frazier's employees—identified by Frazier as JMG, and a Vice President of Operations—had engaged in a scheme whereby he would help CTC pad its bids. (Pl.'s SOF ¶ 14). As part of its business practice, before submitting a customer bid, Frazier would develop an internal budget for installation costs. (*Id.* ¶ 9). According to Frazier, JMG was responsible for setting this budget. (*Id.* ¶ 8). If Frazier won the customer's bid, it would then solicit bids from independent contractors without revealing its internal budget. Frazier alleges that JMG, first, identified projects with considerable profit margins. Then, if CTC's bid for the project was substantially below the internal budget, JMG would inform CTC that it could increase its bid and by how much, while still winning the contract. JMG approved these inflated bids and CTC would split the padded amounts with JMG, after it was paid by Frazier. (*Id.* ¶¶ 14-17). In all, Frazier alleges that the padded sums amounted to at least $1,938,000 and of this JMG received over $960,000—calculations disputed by Navigators. (*Id.* ¶ 19).

Upon discovering this scheme, Frazier confronted and fired JMG. The employer and employee entered into a settlement agreement, as part of which JMG agreed to pay Frazier $2 million and cooperate in Frazier's investigation of the scheme. (*Id.* ¶¶ 18-20). The settlement agreement provides that the amount JMG owes Frazier will be reduced by any recovery Frazier obtains under its crime policies. (Def. SOF ¶ 52). In June 2011, Frazier notified Navigators regarding the scheme. (Pl. SOF ¶ 43). Navigators subsequently denied coverage in a letter dated November 7, 2011. (*Id.* ¶ 44). Navigators justified the denial by stating that the "loss" put forth by Frazier was not as a result of "theft" and, consequently, was not covered by the policies. (Pastor Cert. Ex. O). Frazier initiated an action in New Jersey state court to recover its losses under the Crime Policy, which was then removed to this Court on March 18, 2013. In response, Navigators brought counterclaims seeking declaratory judgments that Frazier's losses were not covered under either policy.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

3

(1986); *Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010). On a summary judgment motion, the moving party must demonstrate that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. A factual dispute is genuine if "a reasonable jury could return a verdict for the non-moving party," and is material if it could affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007). If the non-moving party fails to demonstrate beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

### III. DISCUSSION

Since an insurance policy is a form of contract, its interpretation is a question of law. *Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med.*, 210 N.J. 597, 605 (2012). When considering the meaning of an insurance policy, the court should "interpret the language 'according to its plain and ordinary meaning.'" *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 175 (1992) (citing *Longobardi v. Chubb Ins. Co.*, 121 N.J. 530, 537 (1990)). Nonetheless, the New Jersey Supreme Court has stated that coverage under an insurance policy is "to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured's reasonable expectations." *Selective*, 210 N.J. at 605. However, "a court should not engage in a strained construction to support the imposition of liability." *Longobardi*, 121 N.J. at 537.

The Court faces two threshold issues in these cross-motions for summary judgment: (1) whether the employee and independent contractor's scheme, and the resultant losses claimed by Frazier, constitute "employee theft" and (2) whether the claimed losses are subject to any exclusions in the Crime Policy.[2] In order to determine whether the losses in issue one are due to "employee theft," the Court will tackle the scheme as the money flowed: first, the loss that Frazier suffered from the portion CTC received due to its inflated bids and, second, the loss that

---

[2] A third issue, which policy any potential loss falls under, has been settled by the parties in their briefings. Frazier has stated that they are only seeking recovery under the 2010 Policy, when the scheme was discovered. (Plaintiff's Brief in Opposition to Defendant's Cross-Motion for Summary Judgment ("Pl.'s Opposition") at 22, ECF No. 52).

4

Frazier realized when JMG received his share of the inflated bids. Accordingly, after considering the available case law and the parties' submissions, the Court finds that the independent contractor's inflated bids do not comprise "employee theft" under the terms of the Crime Policy. On the other hand, the sums acquired by the employee from these inflated bids constituted an "unlawful taking" not subject to any of the exclusions in the Crime Policy.

### A. Loss Frazier Suffered From CTC's Inflated Bids

Black's Law defines a "taking" as "[t]he act of seizing an article . . . with an implicit transfer of possession or control." *Black's Law Dictionary* (10th ed. 2014). In interpreting the criminal corollary to the "unlawful taking" language at the heart of the Crime Policy, N.J.S.A. 2C:20-3, New Jersey courts look to whether there was consent from the owner. *E.g., Matter of Hoerst*, 135 N.J. 98, 103 *reinstatement granted* 138 N.J. 85 (1994) (stating that "[t]he essential nature of all 'theft' offenses is . . . the actor appropriates property of the victim without his consent.") As a preface, the Court is mindful of the paucity of case law on this issue. This appears to stem from a change in the language of commercial crime policies—moving away from employee dishonesty and manifest intent towards unlawful taking and employee theft. *See Employee Theft Verses Manifest Intent: The Changing Landscape of Commercial Crime Coverage*, 36 Tort & Ins. L.J. 43, 54 (2000). The unique circumstances of employee theft in each case also make any analogous decisions of limited assistance. Nonetheless, the Court notes that the relevant cases tend to turn on whether the insured authorized the transaction, *see Hartford Fire Ins. Co. v. Mitchell Co.*, Civ. No. 08-00623-KD-N, 2010 WL 5239246, at *6 (S.D. Ala. Dec. 15, 2010) *aff'd*, 11-10185, 440 F. App'x 759 (11th Cir. Sept. 8, 2011); *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, No. 5:10 CV 823, 2013 WL 1338194, at *19 (N.D. Ohio Mar. 29, 2013), and whether the underlying fraudulent nature of the transaction negated such consent, *see Hartford Fire Insurance Co. v. Clark*, 562 F.3d 943, 945 (8th Cir. 2009); *Pine Belt Auto., Inc. v. Royal Indem. Co.*, Civ. No. 06-5995 (JAP), 2008 WL 4682582, at *6 (D.N.J. Oct. 21, 2008) *aff'd*, 400 F. App'x 621 (3d Cir. 2010).

Courts have generally found that payments to third-parties do not qualify as a "loss" under commercial crime policies. *See Pine Belt Auto.*, 2008 WL 4682582, at *3; *Tesoro Ref. & Mktg. Co. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, Civ. No. SA:13-CV-931-DAE, 2015 WL 1529247, at *11 (W.D. Tex. Apr. 7, 2015); *Williams Electronics Games, Inc., v. Barry*, Civ. No. 97 C

3743, 2000 WL 106672, at *1 (N.D. Ill. Jan. 13, 2000). This is the case even where the employer's loss was as a result of the employee colluding with the third-party. *See Mitchell*, 440 F. App'x at 760. In finding so, courts rely on the understanding that such payments are not an "unlawful taking" by the employee and are, therefore, outside the scope of the policies. *See id.* In cases where courts have found a loss under the policy, the entire transaction was a fraudulent setup by the employee and the insured never received the good or service from the third-party, thus negating the employer's authorization. *See Mitchell*, 440 F. App'x at 760 n. 1; *Taylor Chrysler Dodge, Inc. v. Universal Underwriters Ins. Co.*, No. 08 C 4522, 2009 WL 3187234, at *4 (N.D. Ill. Sept. 30, 2009).

Under a "plain and ordinary meaning" reading of the policy language, the padded amounts Frazier paid its independent contractor were not an "unlawful taking" by Frazier's employee. *See Longobardi*, 121 N.J. at 537. Frazier seeks to recover the share of the padded amounts CTC received from the inflated bids, albeit with the help of the employee. Frazier contends that JMG's control over the bidding process necessitates a determination that these amounts were subject to an "unlawful taking." *Cf. Mitchell*, 2010 WL 5239246, at *6 (finding no "unlawful taking" where, although the employee recommended the land, the ultimate decision whether to purchase was made by the employer's board members and other employees); *Tesoro*, 2015 WL 1529247, at *9. However, the Court does not find that the employee's control modifies the inherent nature of Frazier's transaction with CTC.

Frazier bought insurance from Navigators to protect it from employee theft, not against a less favorable deal from a deceitful contractor. Unlike the plaintiff in *Clark*, Frazier does not assert that the underlying transaction was fraudulent and that the independent contractor did not perform its work. *Cf. Clark*, 562 F.3d at 945 (stating that insurance company voluntarily paid out for employee theft where the employer was charged for services that were not provided and the employee approved unreasonable rates). In addition, Frazier has not argued nor demonstrated that CTC's bids were either unreasonably priced or not the lowest for a particular job—the latter likely to be the case otherwise JMG's choice of CTC would have raised suspicions. *Cf. id.* Rather, Frazier set an internal budget and expected that any independent contractor it chose would make a profit on their service. As such, Frazier was not "unknowingly deprived of money." *See Mitchell*, 400 F. App'x at 760. Consequently, the "loss" that Frazier claims here

is—at its core—an inability to obtain the lowest price, and that is not a basis to raise a claim under the Crime Policy. *See Mitchell*, 2010 WL 5239246, at *5.

Therefore, the Court finds that Frazier's claim for the alleged losses from the inflated amounts paid to and received by CTC is not covered by the Crime Policy as a matter of law.

### B.  Loss Frazier Realized From Employee's Share of the Inflated Bids

In contrast, the share of the padded amounts received by JMG were not strictly payments to a third-party, and Frazier had not consented to such payments. In each case, Frazier authorized a payment intended only for CTC, as compensation for the respective installation. JMG's scheme resulted in him receiving a portion of these payments, fraudulently profiting from compensation that Frazier did not intend for him. Thus, the employee's actions are no different than if he inflated the bids himself and skimmed a portion off-the-top, before forwarding the payments on to the unsuspecting contractor. *See Pine Belt Auto.*, 2008 WL 4682582, at *6 (noting an "occurrence" of employee theft where the employee requested checks from his employer's accounting department for legitimate reasons and then fraudulently converted those checks to money orders for his own use.) Put another way, the payment to CTC was merely a pre-text for JMG to receive his share. Consequently, the fact that JMG had the money pass through an intermediary prior to reaching his pocket does not change the fundamental nature of the employee's actions—an "unlawful taking"—nor its effect—to the "deprivation of the insured."

Navigators argues that *Mitchell* is instructive for denying losses even where the employee profits.[3] In *Mitchell*, the employer had authorized payment to an LLC in purchase of land, and intended the money to go to the owner of the land. 2010 WL 5239246, at *6. The fact that the employee was a member of the LLC that owned the land—and received a commission or profit—did not change the nature of the transaction nor did it make it fraudulent, as the employer received the bargained for property. *See id.* Hence, the district and circuit court found that the

---

[3] The other cases relied on by Navigators are distinguishable, as the employees there did not profit from or take money through the alleged scheme. *See, Pine Belt Auto.*, 2008 WL 4682582, at *3 (finding no employee theft where the employee submitted false credit reports requiring the employer to make payments to a third-party); *Williams Electronics*, 2000 WL 106672, at *1 (finding that losses incurred by an employer due to employee's bribes was not covered under crime policy); *Tesoro*, 2015 WL 1529247, at *11 (finding that the loss of fuel sold to a third-party as a result of employee's forged letters of credit was not an "unlawful taking" covered by the crime policy). Accordingly, in such cases, courts have found that the employee's actions did not constitute a "taking."

employee's receipt of money from the seller was not an "unlawful taking," but rather self-dealing.[4] *Id.* Here, however, Frazier intended to pay only its independent contractor for work performed, and had not authorized a payment to JMG. JMG's scheme, and that he was set to take possession of a portion of the payment, made the underlying transaction fraudulent—in so far as it concerned the sums earmarked for the employee.

Therefore, JMG's actions and the portion of the payment ultimately taken by him constituted an "unlawful taking" of Frazier's money, even though he received his share through a third party, and is a "loss" under the Crime Policy.

### i. Exclusion of the Loss

Having determined that Frazier's loss is covered by the Crime Policy, Navigators raises a two-fold argument that the claimed loss is subject to exclusion.[5] The first is that since Frazier's customers paid for the installation costs, Frazier suffered only a "theoretical loss" as to the allegedly inflated amounts. *See F.D.I.C. v. United Pac. Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994). Navigator's argument is unavailing. Per its business practice, Frazier would have kept any additional profit it gained from lowering costs on its end. (Borja Dec'l Ex. H at 104:24-105:3, ECF No. 39-9). Additionally, the sums paid to the independent contractor—and received by the employee—were paid by Frazier out of its bank account. (Pl.'s SOF ¶ 11). Consequently, the money received by the employee was not theoretical, but instead an actual loss of profit that Frazier earned and should have kept, but for the employee's scheme. *See Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 181 N.J. 245, 259 (2004)

---

[4] Frazier asks the Court to expand the definition of "theft" in the Crime Policy to include dishonest acts. *See Guyan*, 2013 WL 1338194, at *19; (Plaintiff's Reply Brief in Further Support of its Motion for Summary Judgment at, 2, ECF No. 60). However, the Court does not find that the policy language construes "theft" and "dishonest act" as equivalents. (*See* Borja Dec'l Ex. A § D(c)). Instead, the exclusion—in an attempt to be as broad as possible—includes "theft" as a subset of dishonest acts, which can comprise conduct such as self-dealing, co-mingling of funds, improper reporting, and unauthorized use. (*See id.*) Consequently, expanding "theft" to include any and all dishonest conduct would "'write for the insured a better policy of insurance than the one purchased.'" *Pine Belt Auto., Inc.*, 2008 WL 4682582, at *6 (quoting *Longobardi*, 121 N.J. at 537); *see Tesoro*, 2015 WL 1523247, at *8. Similarly, Frazier's argument to expand the definition of "theft" by pointing to Navigators' marketing materials is also unpersuasive, as the plain language of the policy excludes losses stemming from employee dishonesty, (*see* Borja Dec'l Ex. A § D(c)), and the marketing materials warn potential insureds that coverage is limited only to the policy's terms, (*see* Pastor Cert., Ex. R, ECF No. 35-3).

[5] Frazier acknowledges that JMG's conduct comprises a single "occurrence" under the Crime Policy. (Pl.'s Opposition at 22).

(applying proximate causation to determine whether employer has suffered a "direct loss" from an employee's dishonest conduct).

The second argument raised by Navigators is that Frazier's claim is an "indirect loss," and it is unpersuasive as well. The loss Frazier claims is for sums paid out by the company as a direct result of its employee's theft. *Cf. Diversified Grp., Inc. v. Van Tassel*, 806 F.2d 1275, 1278 (5th Cir. 1987) (finding in suit by insured over bids lost due to employee dishonesty that the "potential income" provision excluded coverage for the "loss of future profits, or future income flow.") The exclusion specifically limits recovery from any "inability to realize income that [the insured] would have realized had there been no loss of or damage to 'money.'" (Borja Dec'l Ex. A § D(f)). For the exclusion to apply, Frazier would have to be seeking income it could have realized from the profits taken by the employee, such as interest. Rather, Frazier's claimed loss is only for the funds it was set to earn, which were "unlawfully taken" by the employee through the scheme. Therefore, the Crime Policy's "Indirect Loss" exclusion does not apply.

Thus, the Court finds that the share of the padded payments taken by Frazier's employee constitute "employee theft" and are covered by the Crime Policy as a matter of law.

### C. Calculation of Damages

Should its claim for coverage of its alleged losses succeed, Frazier also moves for summary judgment that its losses exceeds the Crime Policy's limits. In response, Navigators argues that JMG's statements are inadmissible hearsay and that, since the forensic accountant's analysis and Frazier's allegations rest solely on these statements, Frazier does not present a viable argument for damages.

"Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009). In this case, JMG's admissions may be admissible at trial as statements against interest under Rule 804(b)(3), Fed. R. Evid., and the Court is not precluded from considering them and the analysis that rests upon them for purposes of this motion for summary judgment. *See, e.g., Morro v. DGMB Casino LLC*, No. 13-CV-5530, 2015 WL 3991144, at *21 n. 2 (D.N.J. June 30, 2015). However, even without JMG's statements, the work undertaken by Frazier's forensic accountant appears to be corroborated by additional evidence sufficient to raise a viable claim for damages. Nonetheless, Navigators presents

9

genuine issues of material fact regarding discrepancies underlying Frazier's accountant's analysis and the conclusions reached as to damages.  Accordingly, the Court denies Frazier's motion for summary judgment that its losses exceed Navigators' policy limits.

### IV.  CONCLUSION

For the above reasons, the parties' cross-motions for summary judgment are **GRANTED in part and DENIED in part**.  Frazier's motion to recover the padded amounts paid to the independent contractor is **DENIED**, and Navigators' cross-motion seeking declaratory judgment as to these amounts is **GRANTED**.  Frazier's motion to recover the employee's share of the padded amounts is **GRANTED**, and Navigators' cross-motion seeking declaratory judgment as to the same is **DENIED**.  Navigators' cross-motion seeking declaratory judgment that Frazier's losses are not covered under the 2009 Policy is **GRANTED**.  Frazier's motion for summary judgment that its losses exceed Navigators' policy limits is **DENIED**.

          /s/ William J. Martini
          **WILLIAM J. MARTINI, U.S.D.J.**

**Date: December 4, 2015**